Filed 5/20/26  In re M.P. CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re M.P., a Person Coming Under the Juvenile Court Law. | |
| STANISLAUS COUNTY COMMUNITY SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>P.S.,<br><br>Defendant and Appellant. | F090247<br><br>(Super. Ct. No. JVDP-24-000138)<br><br>**OPINION** |

-ooOoo-

APPEAL from orders of the Superior Court of Stanislaus County.  Annette Rees, Judge.

Laura D. Pedicini, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas Boze, County Counsel, and Sophia Ahmad, Deputy County Counsel; Gordon-Creed, Kelley, Holl & Sugerman, Jeremy Sugerman, Anne Nguyen and Ellen Wesly, for Plaintiff and Respondent.

-ooOoo-

P.S. (mother) is the mother of M.P., who is the subject of this dependency case. Mother challenges the juvenile court's orders issued at a contested 12-month review hearing (Welf. & Inst. Code,[1] § 366.21, subd. (f)) that resulted in M.P. remaining in out-of-home care and mother's reunification services being terminated. She contends the juvenile court erred by finding reasonable services were provided by the Stanislaus County Community Services Agency (agency).

Mother also asserts the juvenile court and the agency failed to comply with their duty of inquiry under the Indian Child Welfare Act (ICWA). The agency acknowledges that its efforts were not accurately reflected in the record, and it requests a conditional affirmance with directions for the agency to ensure ICWA compliance. We conditionally affirm the orders and remand for the juvenile court and the agency to comply with the inquiry provisions of ICWA and related California law. In all other respects, we affirm the juvenile court's orders.

## FACTUAL AND PROCEDURAL SUMMARY

*Initial Removal*

In June 2024, the Merced County Human Services Agency (Merced HSA), received a referral alleging mother refused to pick up then 12-year-old M.P. from a behavioral hospital. M.P. was admitted to the hospital on a section 5150 hold due to suicidal ideations. Mother left the state and told the hospital that she wanted M.P.'s adult sibling, S.G., to obtain legal guardianship of M.P. S.G. was unwilling to care for M.P., and there were no other caretakers available on M.P.'s expected discharge date from the hospital.

M.P. informed a social worker that the psychiatric hold was placed due to stress caused by mother. The grandmother was often left to care for M.P. while mother was gone from the home. Mother and M.P. would argue and yell at each other when mother

---

[1]     All statutory references are to the Welfare and Institutions Code.

was present in the home. Law enforcement placed M.P. into protective custody based on caretaker absence.

Merced HSA filed a juvenile dependency petition alleging M.P. was described by section 300, subdivisions (b)(1) and (g). The petition alleged M.P. was at risk of suffering serious physical harm as a result of mother's failure to protect and provide adequate food, clothing, shelter, or medical treatment. At the detention hearing held on June 14, 2024, mother and M.P.'s father, Henry P. (father), were both present and appointed counsel. M.P. was detained from the parents' custody, and a combined jurisdiction and disposition hearing was set for July 17, 2024. All contact between the parents and M.P. was to be supervised by the assigned social worker.

### *Jurisdiction and Disposition*

The report prepared for the jurisdiction and disposition hearing recommended the allegation pursuant to section 300, subdivision (b)(1) be found true and family reunification services be provided to mother and father. Merced HSA also requested the matter be transferred to Stanislaus County based on father's current residence. M.P. was placed in a resource family home. Mental health services were already being provided to M.P. through behavioral health. There were no medical or developmental concerns for M.P.

On July 1, 2024, M.P. informed the social worker that he did not want any contact with his mother at that time. He described the argument that occurred on the day before he was admitted to the hospital. Mother began pouring water down M.P.'s back because he tried to hide his phone from her. Law enforcement came to the home, but they did not believe his version of events. Mother left M.P. at home with his grandmother, and he did not know where mother went. On the next day, M.P. told his school counselor that he did not want to live any longer, which resulted in his hospitalization.

The social worker interviewed mother regarding the allegations in the petition. Mother claimed she only left the state because she was worried that father learned of her current residence. She disclosed a history of domestic violence with father, but she denied that M.P. was subjected to any of the violence. Mother also insisted that she did not pick up M.P. from the hospital because she knew M.P. did not want to be around her. It was her belief that S.G. would pick up M.P. from the hospital, but she eventually discovered that S.G. did not want to obtain custody of M.P.

Mother's current mental health treatment included prescription medications and individual therapy. The proposed case plan recommended that mother participate in mental health counseling, a domestic violence assessment, and a parenting program. The visitation schedule included a minimum of monthly in-person and video chat visits to be supervised by the social worker. No visits had occurred at the time of the report due to M.P.'s refusal to have any contact with mother. Father and M.P. had participated in one of their scheduled bi-weekly visits. M.P. and father appeared to be comfortable during their visit.

On July 9, 2024, the social worker spoke to S.G. about her childhood with mother and father. S.G. reported she was no longer in contact with the parents due to the trauma that they inflicted. Both parents were described as extremely angry and volatile individuals. Mother and father's relationship was "on-and-off" for her entire life. She recalled being in the middle of a physical altercation between the parents while holding M.P. S.G. reported M.P. was often left at home with their grandmother, who was aggressive and mean to M.P. S.G. was concerned for M.P. because he was left to fend for himself at a young age.

At a continued jurisdiction and disposition hearing held on July 24, 2024, mother was present and represented by counsel. The allegations in the petition filed pursuant to section 300, subdivision (b)(1) were found true, and family reunification services were

ordered for mother and father. The social worker was ordered to schedule supervised video visitation between M.P. and mother at no less than once per month. The case was transferred to Stanislaus County Superior Court (juvenile court), and a transfer-in hearing was set for July 31, 2024.

***Six-Month Review Period***

On August 20, 2024, the juvenile court transferred the case back to Merced County after the agency was unable to verify father's residence. A six-month review hearing was eventually set for January 8, 2025, in Merced County.

The six-month review report recommended that family reunification services continue for both parents, and the Merced HSA requested the case be transferred to Stanislaus County. Mother continued to live out of state. She was participating in therapy and taking her prescribed medications. Her parenting program was completed in December 2024. The domestic violence program would begin once her psychiatrist felt mother was ready to treat her "domestic violence post-traumatic stress disorder."

The report noted that mother did not have any visits with M.P. during the review period. Mother expressed a desire to participate in visits, but M.P. refused to attend any visits. Merced HSA offered video visits, telephone visits, in-person visits, and letter correspondence, but M.P. refused each method of contact. The social worker indicated that Merced HSA would continue to work with M.P. on attending visitation. Father had not attended any visits because he did not have time to schedule visitation appointments. On January 15, 2025, M.P. stated, "I would like to go with my dad. I don't want to go with my mom, but can I go with my sister, [S.G.]?"

At the continued six-month review hearing held on February 5, 2025, mother's counsel submitted the matter for purposes of the review hearing. The Merced County Juvenile Court found that reasonable services were provided to the parents, and the reunification plan was found to be appropriate. Family reunification services were

ordered to continue for both parents. The social worker was ordered to schedule supervised visits between mother and M.P. at a minimum of once per month. The case was transferred to Stanislaus County with a transfer-in hearing scheduled for February 19, 2025.

***12-Month Review Period***

The juvenile court accepted the transfer from Merced County at the transfer-in hearing. The agency was provided discretion to increase visits for the parents if determined to be appropriate. A transfer-in review hearing was set for March 24, 2025.

The agency prepared a report for the transfer-in review hearing, which recommended the setting of a 12-month review hearing. Mother continued to participate in her services, but the agency did not believe mother understood the gravity of the problems that led to child welfare involvement. She felt M.P. would want to return to her care once M.P. was able to " 'understand' " what happened.

M.P. continued to refuse any form of contact with mother. The visitation schedule in the case plan provided for supervised video visits between mother and M.P. The assigned social worker would be responsible for scheduling visits at least once per month, and the supervisor had the discretion to expand visitation to unsupervised. At the transfer-in review hearing, the juvenile court approved the case plan. The 12-month review hearing was scheduled for July 10, 2025.

The report for the 12-month review hearing recommended family reunification services be terminated for both parents. The agency requested a waiver of the section 366.26 hearing in order for M.P. to remain in foster care with a permanent plan of "Another Permanent Planned Living Arrangement … or fit and willing relative."

M.P. remained placed in the same resource family home for the past six months. He was participating in overnight visits with his adult brother John. John was in the process of obtaining resource family approval to have M.P. placed with him. M.P. met

weekly with his mental health clinician and behavioral therapist. The agency believed he made positive strides with his mental health and self-harm since entering foster care. He was enjoying visits with his older siblings and spending weekends with John.

A summary report from mother's mental health clinician indicated she was "making steady progress in her treatment goals." The social worker offered M.P. multiple options for visitation with mother during monthly home visits, but M.P. was "very adamant about not visiting or having any contact with [mother]." Father informed the social worker that he did not want to complete classes to reunify with M.P. During monthly contacts with mother, the social worker reviewed the case plan and discussed mother's objectives and responsibilities. The social worker's assessment concluded that mother lacked understanding of the reasons M.P. did not want to have a relationship with his parents.

A contested 12-month review hearing was held on July 30, 2025. Mother was present and represented by counsel. Mother's counsel requested the juvenile court find reasonable services were not provided and order family reunification services be continued. Her counsel argued the agency's failure to provide visitation and family counseling resulted in a lack of reasonable services. Counsel for the agency and M.P. both requested the juvenile court to adopt the agency's recommendation to terminate family reunification services.

After hearing argument from counsel, the juvenile court found that the agency provided reasonable services. In making its determination, the juvenile court stated as follows: "the visitation orders have remained open, with broad discretion to the Agency at any time should [M.P.] choose to take advantage of that. And I do hope at some point in the future he feels healed enough to maybe have some contact and answer some questions, but this Court will not physically force him to have that contact during the course of this dependency."

Family reunification services were terminated for both parents, and M.P. was ordered to remain placed in foster care with a permanent plan of placement with a fit and willing relative.  Mother filed a timely notice of appeal.

## DISCUSSION

### I.      Reasonable Services

Mother contends substantial evidence does not support the juvenile court's finding that reasonable services were provided by the agency.

#### A.      *Applicable Law*

Except under circumstances not applicable here, reasonable reunification services must be offered when a child is removed.  (§ 361.5, subd. (a); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.)  Whether the reunification services offered were reasonable and suitable is judged according to the circumstances of the particular case.  (*Earl L.*, at p. 1501.)  "The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances."  (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

Visitation is an important part of the reunification process.  Section 362.1 provides that, where the juvenile court orders reunification services, it must also provide for visitation between the parent and the child.  (§ 362.1, subd. (a)(1)(A).)  "Visitation shall be as frequent as possible, consistent with the well-being of the child[]" and without jeopardizing the safety of the minor.  (§ 362.1, subd. (a)(1)(A)-(B).)  However, visitation orders must be evaluated within the context of the case as a whole and the juvenile court may consider all relevant evidence in making its findings.  (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

#### B.      *Standard of Review*

We review under the substantial evidence standard the juvenile court's finding that reasonable services had been provided or offered.  (*Katie V. v. Superior Court* (2005)

8.

130 Cal.App.4th 586, 598.)  In reviewing the challenged finding, we examine the record in the light most favorable to the juvenile court's order, to determine whether there is substantial evidence from which a reasonable trier of fact could have made the finding under the clear and convincing evidence standard.  (*T.J. v. Superior Court* (2018) 21 Cal.App.5th 1229, 1238.)  We construe all reasonable inferences in favor of a finding regarding the adequacy of an agency's reunification plan and the reasonableness of its efforts.  (*Christopher D. v. Superior Court* (2012) 210 Cal.App.4th 60, 70; *In re Julie M.* (1999) 69 Cal.App.4th 41, 46.)  We likewise resolve conflicts in favor of such a finding and do not reweigh the evidence.  (*In re Jasmine C.* (1999) 70 Cal.App.4th 71, 75.)

### C.    Analysis

Mother contends the juvenile court erred in finding she was provided reasonable services because the visitation order did not result in a single visit between mother and M.P. during the case.  In support of her contention, mother cites to the case of *In re S.H.* (2003) 111 Cal.App.4th 310, 317 (*S.H.*), but the case is distinguishable.

In *S.H.*, the juvenile court ordered monitored visitation for the mother following a contested jurisdiction hearing.  (*S.H.*, *supra*, 111 Cal.App.4th at pp. 312–313.)  At the hearing, the court sustained allegations that the mother failed to protect her children from physical and sexual abuse, and family reunification services were ordered for mother. (*Id*. at pp. 313, 316).  The court did not specify either the frequency or length of the visitation, but it noted that some of the children feared their mother and had refused visits during their initial detention.  (*Id*. at p. 316.)  The visitation order then specified, " '[t]he social worker shall describe to the children the safeguards in place for monitoring for both mother and fathers, and if the children refuse a visit, then they shall not be forced to have a visit.' "  (*Ibid*., fn. omitted.)

On appeal from the jurisdiction hearing, the appellate court reversed the order, finding it "impermissibly delegate[d] to [the] children the authority to determine whether

any visits will occur." (*S.H.*, *supra*, 111 Cal.App.4th at p. 313.) The appellate court acknowledged the order "affirmatively determine[d]" the mother's right to visitation "rather than making [it] entirely contingent on the child's consent." (*Id*. at p. 318.) It also noted the juvenile court made additional orders designed to encourage visitation, including ordering counseling for the children and for the mother. (*Id*. at pp. 318–319.) Nevertheless, the appellate court concluded that "by failing to mandate any minimum number of monitored visits per month or even to order that *some* visitation *must* occur each month, the [juvenile] court's abstract recognition of [the mother's] right to visitation [was] illusory, transforming the children's ability to refuse 'a visit' into the practical ability to forestall any visits at all." (*Id*. at p. 319.)

Contrasted with the lack of guidance from the juvenile court in *S.H.* is the order issued in *In re Sofia M.* (2018) 24 Cal.App.5th 1038 (*Sofia M.*). There the appellate court determined that a juvenile court has no duty to ensure that the child welfare agency's efforts are ultimately effective in overcoming a minor's opposition to visitation. (*Id.* at p. 1047.) The case involved a teenage dependent's refusal to visit her mother. The visitation order expressly provided for visitation twice a week, four hours at a time, and the mother, after attending an initial monitored visit, failed to regularly meet with the daughter, leading to the daughter's eventual opposition to further visits. (*Id.* at pp. 1041–1042, 1046.) In other words, the order contained explicit acknowledgment of the mother's right to regular visitation, but after reasonable efforts were exhausted, the child could not be persuaded to visit. The appellate court concluded that these unsuccessful efforts were not a basis for reversal. (*Id.* at p. 1047.)

In the present case, the juvenile court never forbade contact, and the agency encouraged M.P. to visit during each of the social worker's monthly contacts. The social worker offered video visits, telephone visits, in-person visits, and letter correspondence, but M.P. refused each of those methods of contact. Both mother and M.P. were

participating in mental health services, and there is no evidence that either clinician recommended that family therapy was appropriate.

The mere existence of services that were not yet therapeutically recommended does not undermine the adequacy of the services that mother did receive. (*In re Misako R.*, *supra*, 2 Cal.App.4th at p. 547 ["In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect" but the standard is "whether the services were reasonable under the circumstances."].) The services were reasonable under the circumstances of this case when no mental health professional recommended family therapy. (*Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1426.)

Furthermore, M.P. refused visits, but the court never vested absolute discretion over visitation to M.P. The visitation order continued to require the agency to schedule visits between mother and M.P. at least once per month. The agency continued to make efforts to encourage M.P. to visit with mother each month, but these efforts were ultimately unsuccessful. The court's concluding statement that it would not physically force M.P. to visit recognized the practical limits of its visitation order. (Accord, Cal. Code Regs., tit. 22, §§ 80072, subd. (a)(3) [foster youth have right to be free from coercion], subd. (a)(7) [foster youth cannot be locked in any room, building, or premises], subd. (a)(8) [foster youth cannot be placed in restraining device], 89475.2, subd. (a) [foster caregivers shall not restrain child].)

In sum, mother has failed to demonstrate that the services provided to her were deficient. The agency made consistent efforts to address the barrier of M.P.'s refusal to visit with mother. Unfortunately, there were no options available to the agency short of inflicting additional trauma on M.P. by physically forcing or restraining him to participate in visits with mother. The lack of family therapy was also reasonable given the regular attempts made by the agency to encourage M.P. to participate in various

forms of contact. The agency provided mother with reasonable reunification services, and we reject her claim to the contrary.

## II. ICWA Inquiry

Mother also contends the juvenile court's finding that ICWA did not apply was not supported by sufficient evidence because the record does not include interviews conducted by the department with available extended family members regarding M.P.'s potential Indian ancestry.

### A. *Additional Background*

In June 2024, mother claimed that she may have Indian ancestry through the Cherokee tribe and Comanche Nation. The maternal grandmother was contacted regarding potential placement of M.P., and M.P.'s adult siblings, John and S.G., were referred for monthly supervised visits. However, the jurisdiction and disposition report did not contain any inquiry of extended family members regarding possible Indian ancestry.

Merced HSA contacted the Cherokee Nation and provided the names and dates of birth for M.P. and the parents, and the maternal grandmother's full name was also provided in the inquiry. The Cherokee Nation responded that M.P. did not have Cherokee ancestry. On June 18, 2024, Merced HSA sent a "NOTICE OF CHILD CUSTODY PROCEEDING FOR INDIAN CHILD" form (ICWA-030) to the Bureau of Indian Affairs, three Cherokee tribes, and the Comanche tribe. Each of the tribes responded that M.P. was not eligible for membership in their respective tribe. On February 5, 2025, the Merced County Juvenile Court found ICWA was not applicable, and the case was transferred to Stanislaus County.

The agency's report for the 12-month review hearing included a printout entitled "Youth Connections," which identified several maternal and paternal family members for M.P. The agency sent connection letters to all living family members on March 5, 2025.

12.

There is no indication that the letters requested any information relating to mother's claim of Cherokee and Comanche ancestry. The ICWA status section of the report stated ICWA does not apply, and there were no details of any inquiry of extended family members. At the 12-month review hearing, the juvenile court adopted the agency's recommended finding that ICWA did not apply to the proceedings.

### B. Analysis

Under California's statutory scheme to comply with ICWA, the court and county child welfare department "have an affirmative and continuing duty to inquire whether a child," who is the subject of a juvenile dependency petition, "is or may be an Indian child." (§ 224.2, subd. (a); see *In re Isaiah W.* (2016) 1 Cal.5th 1, 9; Cal. Rules of Court, rule 5.481(a).) The agency's initial duty of inquiry includes "asking the child, parents, legal guardian, Indian custodian, extended family members, others who have an interest in the child, and the party reporting child abuse or neglect, whether the child is, or may be, an Indian child." (§ 224.2, subd. (b)(2).)

When initial inquiry gives rise to a "reason to believe" (but not sufficient evidence to determine there is a "reason to know") that an Indian child is involved in a proceeding, "further inquiry regarding the possible Indian status of the child" is required, which includes gathering additional biographical information from family members and contacting relevant tribes. (§ 224.2, subd. (e)(2)(A)–(C).) "Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or citizenship eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2)(C).)

The agency "must on an ongoing basis include in its filings a detailed description of all inquiries, and further inquiries it has undertaken, and all information received pertaining to the child's Indian status, as well as evidence of how and when this information was provided to the relevant tribes." (Cal. Rules of Court, rule 5.481(a)(5).)

13.

Before finding ICWA inapplicable, the juvenile court must make a finding that the agency conducted a "proper and adequate further inquiry" and exercised "due diligence" in doing so, and that "there is no reason to know whether the child is an Indian child." (§ 224.2, subd. (i)(2).)

We review the juvenile court's finding that there is no reason to know whether a child is an Indian child for substantial evidence, and the court's finding that the agency has conducted a proper and adequate inquiry and due diligence for abuse of discretion. (*In re K.H.* (2022) 84 Cal.App.5th 566, 600–601.)

### C.     Analysis

Mother contends the juvenile court's finding that ICWA did not apply was not supported by sufficient evidence because the agency did not ask multiple available extended family members about mother's claim of Indian ancestry. The department concedes that it failed to document its ICWA inquiry, but it contends the defect can be cured because the case is ongoing citing to *In re S.H.* (2022) 82 Cal.App.5th 166, 179.

In the present case, mother claimed possible Indian ancestry through the Cherokee and Comanche tribes. Merced HSA sent formal notice to the Cherokee and Comanche tribes, and none of the tribes indicated M.P. was a member or eligible for membership in their tribe based on the information provided.

The agency was also required to ask extended family members about the child's possible Indian ancestry pursuant to its duty of further inquiry. (§ 224.2, subd. (e).) Extended family members include adults who are the child's stepparents, grandparents, siblings, brothers-or sisters-in-law, aunts, uncles, nieces, nephews, and first or second cousins. (25 U.S.C. § 1903(2); § 224.1, subd. (c).) There were at least three extended family members, the maternal grandmother and adult siblings, S.G. and John, who were considered for placement during the proceedings. However, both child welfare agencies either failed to ask these extended family members about Indian ancestry or did not

14.

provide adequate documentation.  Under the circumstances, we accept the agency's concession and conclude the agency did not fulfill its statutory duty of further inquiry.

In light of its acknowledgment, the agency argues that the appropriate remedy is simply to affirm the judgment, citing the case of *In re S.H.*, *supra*, 82 Cal.App.5th 166. In *In re S.H.*, the mother appealed from the dispositional order, arguing inadequate ICWA inquiry, and the agency conceded the error.  (*S.H.*, at pp. 170–171.)  The court held that "when a social services agency accepts its obligation to satisfy its inquiry obligations under ICWA, a reversal of an early dependency order is not warranted simply because a parent has shown that these ongoing obligations had not yet been satisfied as of the time the parent appealed."  (*Id*. at p. 171.)  Instead, if "the social service agency acknowledges error and we thus have reason to believe that its duty of inquiry will be satisfied[,] … we see no reason to set aside the jurisdiction/disposition order—even conditionally" because "the duty to inquire is a *continuing* one [citing Welfare and Institutions Code section 224.2, subd. (a)]" and a conditional reversal "may lead to unnecessary additional hearings, delay, and the micromanagement of further ICWA inquiry."  (*Id*. at pp. 176–177.)  The court affirmed with the understanding that "[t]he Agency must comply with its broad duty to comp[l]ete all appropriate inquiries and apprise the court, and the court has a continuing duty to ensure that the Agency provides the missing information."  (*Id*. at p. 179.)

Because the juvenile court and the agency have an affirmative and continuing duty to inquire into the child's Indian status, and the juvenile court retains the power to reverse a prior finding that ICWA does not apply, it may make little or no practical difference whether we vacate the court's ICWA finding.  Nonetheless, at least on this record, we find it appropriate to do so.  To affirm the orders unequivocally leaves intact an implicit judicial finding of ICWA compliance that the parties agree is not supported by substantial evidence.  While the agency will continue its investigation and the juvenile court may

make a different finding in the future, here the previous inquiries by the court and the agency separately fell short. Under the circumstances, we conclude there is no reason to let the court's ICWA finding stand.

## **DISPOSITION**

The juvenile court's orders are conditionally affirmed. The juvenile court's July 30, 2025 finding that ICWA does not apply is vacated. We remand for the agency and the juvenile court to comply with the inquiry provisions of ICWA and California law. If the court finds M.P. is an Indian child, it shall conduct new proceedings in compliance with ICWA and related California law. If not, the court's original orders will remain in effect.


DE SANTOS, J.

WE CONCUR:


FRANSON, Acting P. J.


SNAUFFER, J.

16.